**COURT OF APPEALS
DECISION
DATED AND FILED**

**May 12, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP161**

**STATE OF WISCONSIN**

Cir. Ct. No.  2018TP188

**IN COURT OF APPEALS
DISTRICT I**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO **R.W.**, A PERSON UNDER THE AGE OF **18**:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

J. W.,

      RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: GWENDOLYN G. CONNOLLY, Judge. *Affirmed*

¶1 DUGAN, J.[1]¶ J.W. appeals the order terminating his parental rights to his biological child, R.W. J.W. argues that the trial court erroneously exercised its discretion when it terminated J.W.'s parental rights because the trial court's decision was based on its determination that J.W. was unlikely to meet the conditions of return for his daughter because J.W. has a learning disability with respect to reading and writing.[2] We disagree and, therefore, affirm.

## BACKGROUND

¶2 R.W. was born on December 5, 2016, and will be four years old in December 2020. J.W. is her biological father.

¶3 Nine days after birth, R.W. was released from a hospital neonatal intensive care unit. She was then immediately detained at the request of the Division of Milwaukee Child Protective Services, and placed with foster parents.

¶4 An order for temporary physical custody was issued on December 15, 2016, based on a probable cause finding that J.W. had sexually

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Pursuant to WIS. STAT. RULE 809.107(6)(e), this court is required to issue a decision within thirty days after the filing of the reply brief. We may extend the deadline pursuant to WIS. STAT. RULE 809.82(2)(e) upon our own motion or for good cause. *See Rhonda R.D. v. Franklin R.D.*, 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995). On our own motion, we now extend the decisional deadline through the date of this decision.

[2] J.W. also argues that the trial court violated his constitutional right to equal protection by terminating his parental rights based on his learning disability. As we will further explain, we conclude that the trial court properly referenced and analyzed all six of the factors set forth in WIS. STAT. § 48.426(3), and found that it was in the best interests of R.W. to terminate J.W.'s parental rights—J.W. overemphasizes the trial court's passing comment about the parents' cognitive issues. Therefore, we do not address his constitutional argument. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (stating that, as an appellate court, we decide cases on the narrowest possible grounds).

assaulted one of I.P.K's minor daughters and that I.P.K. would allow J.W. to be around her children because she did not believe that J.W. had sexually assaulted her daughter.[3]

¶5 J.W. was charged with second-degree sexual assault of I.P.K.'s minor daughter on November 14, 2016, and he was taken into custody and detained no later than December 6, 2016.[4]

¶6 On May 2, 2017, R.W. was found to be a child in need of protection and services (CHIPS). Based on that finding, the trial court entered a dispositional order placing R.W. outside of the parental home.[5]

---

[3] R.W. was also detained due to concerns that her mother, I.P.K., did not have the knowledge or skills to care for an infant and that, although I.P.K. had received training from hospital medical personnel, I.P.K. could not understand or meet R.W.'s medical needs, which included low bilirubin levels, vomiting, and aspirating.

After R.W. was been detained, I.P.K. was psychologically evaluated and diagnosed with cognitive delay, an adjustment disorder, and depressive patterns.

[4] The record contains several different dates for J.W.'s arrest on the 2016 sexual assault charge. Specifically, at a May 13, 2019 hearing in this case, the following dates were given for J.W.'s detention on the 2016 sexual assault charge, February 5, 2016; December 5, 2016; and December 25, 2016. In their appellate briefs, the parties also cite different dates for J.W.'s. arrest.

According to the Wisconsin Consolidated Court Automation Programs (CCAP) in J.W.'s 2016 criminal sexual assault case, the arrest warrant was executed on December 6, 2016, and J.W. appeared before the circuit court presiding over the sexual assault case on December 7, 2016. *See Kirk v. Credit Acceptance Corp*, 2013 WI App 32, ¶15 n.1, 346 Wis. 2d 635, 829 N.W.2d 522 (stating that we may take judicial notice of information on CCAP, an online case management system reflecting information entered by court staff.).

[5] As of the date that the dispositional order as to R.W. was issued by the trial court, R.W.'s siblings had been found to be in need of protection and services due to sexual abuse by J.W., neglect of all the children, and concerns regarding I.P.K.'s protective capacities.

¶7 On June 25, 2018, after the charge against J.W. for the second-degree sexual assault of I.P.K.'s daughter was dismissed because the victim was unable to reliably testify, J.W. was released from custody. However, the Division of Milwaukee Child Protective Services had continuing safety concerns with regard to J.W.'s sexual assault of I.P.K.'s child and reports that J.W. had sexually assaulted three other minor children.

¶8 On August 9, 2018, the State filed a petition to terminate J.W.'s parental rights on the grounds that R.W. was a child in continuing need of protection and services and that J.W. had failed to assume parental responsibility.[6] The petition also sought to terminate I.P.K.'s parental rights on the same grounds. When the petition was filed, R.W. remained continuously outside the parental home since birth and the dispositional order placing R.W. outside the parental home had been extended through December 5, 2028.

¶9 In October 2018, J.W. began having weekly one-hour therapeutic visits with R.W. The therapist overseeing J.W.'s initial visits with R.W. was concerned that J.W. did not have age-appropriate expectations for R.W., who was twenty-two months old as of October 2018, and that J.W. became frustrated with R.W. for not being comfortable with him. The therapist indicated that J.W.'s empathy for R.W. improved slightly and that the visits became more positive as R.W. started to get more comfortable with the routine. The therapeutic visits lasted for approximately five or six months. In May 2019, the visits became

---

[6] With respect to J.W., the petition for termination of the parental rights alleged that he had exhibited a pattern of sexual abuse of children, and it described the allegations with respect to a total of four minor children. The sexual assault allegations were from the summer of 1999, June 2000, and November 13, 2002. They were also from cases that were charged on October 18, 2001 and November 16, 2016.

standard weekly supervised visits that lasted two hours. The visits remained limited to two hours per week at the time of the dispositional hearing.

¶10 On the May 13, 2019 date for the grounds phase trial as to J.W., his trial counsel advised the trial court that J.W. wanted to enter a no-contest plea to the failure to assume parental responsibility ground.[7] The trial court engaged in a colloquy with J.W. and accepted his plea. During the colloquy, J.W. testified that he completed eleventh grade, that he had been in special education classes for reading, writing, and spelling, and that he had continued to have difficulty reading and writing. The trial court also admitted into evidence certified records of the underlying CHIPS proceedings and heard the case manager's summary of the underlying facts in support of the failure to assume responsibility ground.

¶11 Based upon the testimony and evidence presented, the trial court found that the State had established the no-contest ground of failure to assume parental responsibility by clear and convincing evidence, that J.W. was unfit to parent R.W., and adjourned the matter for a contested dispositional hearing.[8]

---

[7] Wisconsin has a two-part statutory procedure for an involuntary TPR. *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the grounds phase, the petitioner must prove by clear and convincing evidence that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists. *See* WIS. STAT. § 48.31(1); *Steven V.*, 271 Wis. 2d 1, ¶¶24-25. In the dispositional phase, the court must decide if it is in the child's best interest that the parent's rights be permanently extinguished. *See* WIS. STAT. § 48.426(2); *Steven V.*, 271 Wis. 2d 1, ¶27.

The trial court also presided over I.P.K.'s bench trial on the grounds phase and found that the State had established by clear and convincing evidence the grounds that R.W. continued to be a child in need of protective services and that I.P.K. had failed to assume parental responsibility, and found that I.P.K. was unfit as a parent.

[8] The State dismissed the child in continuing need of protection and services ground of the petition against J.W.

¶12    On September 4, 2019, the trial court presided over J.W.'s contested dispositional hearing and heard the testimony of the family case manager and the foster parent who cared for R.W. since December 14, 2016—nine days after R.W. was born.  The family case manager testified that, although J.W. demonstrated appropriate parenting during his visits, she did not consider R.W. to have a substantial relationship with J.W. and she did not believe that termination of R.W.'s relationship with J.W. would be harmful to R.W.  She noted that J.W. never called the foster parents and did not have any other contact with R.W. besides the weekly supervised visits.  She testified that J.W. had not made the progress needed to show that he could provide basic twenty-four hour care for R.W., R.W. did not see him as a parental figure and did not have a substantial relationship with him, and the Division of Milwaukee Child Protective Services continued to have safety concerns in regard to J.W.'s alleged past sexual assaults.

¶13    The family case manager also testified that J.W. was involved in a three-part parenting program and had completed the first two parts.  Trial counsel then asked the family case manager, "And he's doing this despite, you're aware [J.W.] has a learning disability, correct?"  The family case manager said, "Yes." The family case manager further testified that "Children's Hospital is able to work with [J.W.] in regards to his learning disability so he does have a one-on-one worker that works with him to help him read … the questions on the worksheets, to help him write down his answers, just to help him engage with the learning disability."

¶14    During the hearing R.W.'s guardian *ad litem* expressed his opinion that terminating J.W.'s parental rights was in R.W.'s best interest.  At the conclusion of the hearing, the trial court rendered an oral decision holding that it was in the best interests of R.W. to terminate both J.W.'s and I.P.K's parental

rights to her. The trial court subsequently issued a written order terminating J.W. and I.P.K.'s parental rights to R.W.

¶15     This appeal follows. We refer to additional facts in our discussion.

## DISCUSSION

¶16     J.W. argues that the trial court erroneously exercised its discretion when it terminated J.W.'s parental rights because the trial court's decision was based on its determination that J.W. was unlikely to meet the conditions of return for R.W. because J.W. has a learning disability with respect to reading and writing.

¶17     We conclude that the trial court properly exercised its discretion and, therefore, affirm. More specifically, we conclude that J.W. places undue weight on the trial court's brief comment, made in passing, about J.W.'s learning disability and that J.W. has not shown that the trial court improperly relied on that disability in weighing the six factors set forth in WIS. STAT. § 48.426(3), and determining that terminating J.W.'s parental rights was in the best interests of R.W.

### I.     Applicable law and the standard of review

¶18     At the dispositional phase of a termination of parental rights proceeding, the trial court must determine whether it is in the child's best interests to terminate parental rights. WIS. STAT. § 48.426(2); *Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856. At a minimum, six factors set forth in WIS. STAT. § 48.426(3) must be considered by the trial court in deciding what is in the child's best interests. *See Steven V.*, 271 Wis. 2d 1, ¶27. The weight afforded to a particular factor is left to the trial court's discretion so long as it

7

satisfied the requisites for the exercise of discretion. *See State v. Margaret H.*, 2000 WI 42, ¶¶29, 35, 234 Wis. 2d 606, 610 N.W.2d 475.

¶19 Ultimately, the decision whether or not to terminate parental rights is a matter within the trial court's discretion. *Id.*, ¶27. We will uphold the trial court's decision to terminate parental rights "if there is a proper exercise of discretion." *See id.*, ¶32. A trial court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane Cty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. The trial court is "the ultimate and final arbiter of the credibility of witnesses," and we must accept the trial court's credibility determination. *See Kimberly Area Sch. Dist. v. Zdanovec*, 222 Wis. 2d 27, 50, 586 N.W.2d 41 (Ct. App. 1998). We will not set aside the court's underlying factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶20 In the trial court's decision making process, "the best interests of the child is the paramount consideration[.]" *Margaret H.*, 234 Wis. 2d 606, ¶33. To establish this, the trial court should reference the factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon in explaining, on the record, the basis for the disposition. *Sheboygan Cty. DHHS v. Julie A.B.*, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402. The factors set forth in § 48.426(3) include:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

(c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

(d) The wishes of the child.

(e) The duration of the separation of the parent from the child.

(f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

## II. The trial court properly exercised its discretion when it determined that termination of J.W.'s parental rights was in the best interest of R.W.

¶21     When rendering its decision, the trial court noted that it would be considering all of the testimony, exhibits, and court reports previously filed in this case.  Additionally, the trial court stated that it would consider all of that evidence in light of the factors set forth in WIS. STAT. § 48.426(3), and with respect to the best interests of R.W. as required by § 48.426(2).

¶22     J.W. does not challenge the trial court's factual findings with respect to factors one through five of the six factors, and he concedes that the trial court discussed the six required statutory factors.   Rather, J.W. argues that in considering the sixth factor—whether R.W. would be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of R.W.'s current placement, the likelihood of future placements and the results of prior placements—the trial court's decision was based on its determination that J.W. was unlikely to meet the conditions of return for his daughter because J.W. has a learning disability with respect to reading and writing.

¶23 We address each factor and J.W.'s argument pertaining to the sixth factor, and conclude that the trial court examined the relevant facts, applied a proper standard of law, and using a demonstrated rational process reached a conclusion that a reasonable judge could reach. *See Mable K.*, 346 Wis. 2d 396, ¶39.

*Likelihood of adoption*

¶24 The trial court first determined that R.W. would be "highly" adoptable after the termination of parental rights. R.W. had lived with the same foster parents since her release from the hospital when she was nine days old[9] and they had been supportive of R.W.'s medical needs over that two and one-half year period, including her needs for occupational and physical therapy. R.W.'s foster parents had been approved for adoption and it was very likely that they would adopt R.W. if parental rights were terminated. The trial court further noted that there were no barriers to either foster parent moving forward with adoption. However, the trial court further found that, even if something interfered with that adoption, R.W. was a highly adoptable child because she was young and well adjusted. Based on these considerations, the trial court found that this factor weighed in favor of termination of parental rights.

---

[9] At a later time R.W.'s younger brother was also placed with the same foster parents.

### *Age and health of R.W.*

¶25    The trial court next discussed the age and the health of R.W.  The trial court noted that R.W. had several health issues at birth, including torticollis.[10] That condition precipitated the need for occupational and physical therapy and, as a result of that therapy, it was no longer a problem.  R.W. also had acid reflux and eczema at birth which, although continuing, was initially managed with medications and, more recently, with a diet developed by the foster mothers in consultation with R.W.'s doctors.  The trial court concluded that R.W.'s age and health weighed in favor of termination of parental rights.

### *Substantial relationships with parents and other family members and harm from severance*

¶26    The trial court then addressed R.W.'s relationship with her biological parents and other family members and whether it would be harmful to them to sever the relationships.  The trial court found that J.W. did not have a substantial relationship with R.W. that if terminated would work a harm on her. The trial court found that it was only in October 2018 that J.W. was available to have a relationship with R.W. and, while he had demonstrated a commitment to weekly visits with few exceptions, the visitation began with only one hour a week and had only increased to two hours a week.

---

[10] "Congenital muscula torticollis, also called twisted neck or wry neck, is a condition in which an infant holds his or her head tilted to one side and has difficulty turning the head to the opposite side.…  For most babies, stretching exercises and simple changes in how the infant is held or positioned will gradually lengthen the muscle and correct the problem." *See* https://orthoinfo.aaos.org/en/diseases--conditions/congenital-muscular-torticollis-twisted-neck (last visited April 29, 2020).

¶27     The trial court then pointed out that the standard it applies when viewing "the evidence is what is in the best interest of [R.W.]." It went on to state "[c]hildhood is fleeting. It is very short truth be told, and at the pace at which the relationship that [J.W.] has been able to cultivate thus far, with a child who's two and a half, does not bode well, frankly, for the development of a substantial relationship any time soon[.]" The trial court found that this factor weighed in favor of terminating parental rights.

### The wishes of R.W.

¶28     The trial court next addressed R.W.'s wishes. The trial court found that the factor was not a consideration because there had been no evidence that it could reasonably rely on relating to R.W.'s wishes.

### Duration of the separation from the parent

¶29     The trial court next addressed how long R.W. had been separated from the parents. She had been placed outside the parental home with the adoptive resource for her entire life. J.W. did not have contact with R.W. until October 2018, meaning that it had only been nine or ten months during which there was any recognition of who J.W. was in R.W.'s life. Weighing this factor in light of the best interests of R.W., the trial court concluded that the duration of the separation from J.W. favored the termination of parental rights.

### The ability of R.W. to enter into a more stable relationship if parental rights were terminated

¶30     The trial court next considered whether R.W. would be able enter a more stable and permanent relationship if parental rights were terminated. As noted above, the family case manager testified at the dispositional hearing that she

believed that R.W. would linger in foster care if the parental rights were not terminated because it was her opinion that J.W. had not made "the progress needed in order to show that he can demonstrate basic twenty-four hour care for [R.W.]." The family case manager also testified that "[R.W] still is not comfortable with [J.W.]. She doesn't look to him for her basic needs. There are times where she's trying to leave the visit early because I think she's just done with the situation. She just doesn't look to him as a father figure." She also expressed her opinion that she did not believe that terminating J.W.'s parental rights would be harmful for R.W.

¶31     The trial court noted that R.W. had lived with the foster mothers for the entirety of her life, that the placement was highly supportive of R.W. and her needs, and that R.W. had adjusted well to the placement. The trial court also noted that there was a strong likelihood that R.W. would remain in foster care in the future because neither J.W. nor I.P.K. had been able to meet the conditions of safe return for R.W. In addition to the above, the trial court passingly mentioned that, in its view, they were not likely to meet those conditions "to some extent in light of recognized cognitive issues that each of them have[.]" Thus, the trial court concluded that the ability of R.W. to enter into a more stable relationship if parental rights were terminated, viewed in light of the evidence presented and the standard which is the best interests of R.W., favored the termination of J.W.'s parental rights.

¶32     The trial court ended its analysis of the six factors by stating that it had concluded that the State had demonstrated that it was in the best interests of R.W. that J.W.'s parental rights be terminated.

13

*Summary*

¶33    The record demonstrates that the trial court's weighing of the six statutory factors in WIS. STAT. § 48.426(3), which is inherent in its exercise of discretion.    What J.W. actually contests is the trial court's conclusion and reasoning based on its consideration of the relevant factors.    More specifically, in an effort to discredit the trial court's thorough analysis of the six correct statutory factors, J.W. overemphasizes the trial court's comment, made in passing, about the parents' cognitive issues.    J.W. has not shown that the trial court improperly relied on that single passing comment in weighing the six factors and determining that terminating J.W.'s parental rights was in the best interests of R.W.

¶34    J.W. relies on *State v. Travis*, 2013 WI 38, ¶47, 347 Wis. 2d 142, 832 N.W.2d 491, as holding that when the trial court relies on inaccurate information or the record does not support the court's finding it is an erroneous exercise of discretion.    *Travis* involved a trial court that sentenced the defendant believing that the charge involved a five-year mandatory minimum period of imprisonment and the trial court giving "explicit attention to the misinformation." *See id.*, ¶¶44-49 (citation omitted).    By contrast, here, the trial court did not particularly rely on the passing comment to consider something that was not part of the relevant factors.    *See State v. Alexander*, 2015 WI 6, ¶33, 360 Wis. 2d 292, 858 N.W.2d 662 (stating that the trial court did not actually rely on an improper factor in sentencing because "the sentencing transcript reveal[ed] that the [trial] court did not give explicit attention to the [defendant's] compelled statements, and information from those statements did not form part of the basis for the sentence imposed.")

14

¶35    As stated, J.W. does not argue that the trial court failed to consider and analyze the six required statutory factors.  He also failed to demonstrate that the trial court did not apply a proper standard of law or use a demonstrated rational process to reach a conclusion that a reasonable judge could reach.  *See Mable K.*, 346 Wis. 2d 396, ¶39.  Rather, J.W. has constructed an argument based on a few stray words to challenge the weight that the trial court afforded to each of the required factors in determining the harm caused by the termination of his parental rights.  Based on our review of the trial court's findings, its application of the relevant law, and its demonstrated rational process, we conclude that the trial court properly exercised its discretion deciding that termination of J.W.'s parental rights was in the best interests of R.W.  *See id.*  Therefore, we affirm.

## CONCLUSION

¶36    In sum, we conclude that the trial court reasonably exercised its discretion in determining that the termination of J.W.'s parental rights was in the best interests of R.W.  *See Margaret H.*, 234 Wis. 2d 606, ¶¶32-33.  Therefore, we affirm the trial court's order.

   *By the Court.*—Order affirmed.

   This opinion will not be published. WIS. STAT. RULE 809.23(1)(b)(4).

15